UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JODY MANZER and | ) | |
| EVERETT PEARY , | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:10-cv-00160-JAW |
| v. | ) | |
| | ) | |
| TOWN OF ANSON, | ) | |
| DARROL BARTLETT, DOUGLAS | ) | |
| CAHILL, FLOYD LANE, ARNOLD | ) | |
| LUCE, INEZ MOODY, and | ) | |
| KEVIN LITTLE, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**

In this action between municipal employees and the Town of Anson, Maine and its individual Selectmen, the Selectmen have moved to dismiss the claims against them in their individual capacities. Because the Plaintiffs have sufficiently pleaded a claim against each Selectman in his individual capacity and because the Selectmen are not entitled to qualified immunity, the Court denies the motion to dismiss.

## I.     STATEMENT OF FACTS

### A.     Procedural History

On April 26, 2010, Jody Manzer and Everett Peary (Plaintiffs) filed a complaint alleging violations of the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983 (Count I), and retaliation under the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. § 831 *et seq.*, and the Maine

Human Rights Act (MHRA), 5 M.R.S. § 4551 *et seq.* (Count II). *Compl.* (Docket # 1). The Complaint named as defendants the Town of Anson, five of the town's Selectmen, and the Road Commissioner. *Compl.* ¶¶ 5–10. The Selectmen are Darrol Bartlett, Douglass Cahill, Floyd Lane, Arnold Luce, and Inez Moody; the Road Commissioner is Kevin Little. *Id.* On September 3, 2010, the Defendants moved to dismiss the Selectmen from Counts I and II, and to dismiss Mr. Little from Count II.[1] *Individual Defs.' Mot. to Dismiss* (Docket # 5) (*Defs.' Mot.*). On September 24, 2010, the Plaintiffs responded. *Pls.' Objection to Individual Defs.' Mot. to Dismiss* (Docket # 8) (*Pls.' Opp'n.*). On October 1, 2010, the Defendants replied to the Plaintiffs' response. *Reply to Pls.' Objection to Individual Defs.' Mot. to Dismiss* (Docket # 9) (*Defs.' Reply*).

**B.    The Complaint**

**1.    The Parties**

Jody Manzer and Everett Peary are residents of the town of Anson, Maine (Town of Anson). *Compl.* ¶¶ 2, 3. With one exception, each individual Defendant is a Selectperson of the Town; the exception is Kevin Little, the Road Commissioner. *Id.* ¶¶ 5-10. Both Mr. Manzer and Mr. Peary were employed as full time equipment operators and drivers for the Town; Mr. Manzer for fourteen years, from June 1, 1994 to April 7, 2008 and Mr. Peary from June 1, 1998 to April 7, 2008. *Id.* ¶¶ 14, 15. Before September 1, 2007, they were supervised by Town of Anson Road

---

[1] Count II only alleges violations by the Town of Anson. *Compl.* 67. Accordingly, the Court only addresses whether the individual Selectmen should be dismissed from Count I.

Commissioner William Lynds; on September 1, 2007, Kevin Little replaced Mr. Lynds. *Id.* ¶ 16.

### 2.    A List of Unsafe and Illegal Practices

After Mr. Lynds announced his resignation but before his last day, Messrs. Manzer and Peary compiled a list of unsafe or illegal practices they claimed Mr. Lynds had been responsible for, and they brought this list to a meeting with Selectmen Douglas Cahill and Arnold Luce. *Id.* ¶¶ 17, 18. The next evening, Mr. Cahill came to Mr. Peary's home and obtained a copy of the list, which he said he was going to distribute among all the Selectmen. *Id.* ¶ 19. The Plaintiffs' complaints did not stop, however, with Mr. Lynds; they continued after Mr. Little assumed the Road Commissioner position.

### 3.    December 18, 2007 Sewage Leak

While clearing snow on December 19, 2007, Mr. Manzer discovered that a sewer line was blocked, causing 45,000 gallons of sewage to exit the system through a manhole and run into the Kennebec River. *Id.* ¶ 23. This spillage had been going on for twelve days and Messrs. Manzer and Peary worked all day to clear the blockage. *Id.* The Department of Environmental Protection (DEP) issued a non-compliance/discharge incident report to the Town on December 19, 2007 for this incident. *Id.* ¶ 23a. On December 19, 2007, Mr. Manzer asked Mr. Little about cleaning up the sewage and Mr. Little replied that "the snow will cover it up." *Id.* ¶ 24.

### 4.    A Mid-January 2008 Masonic Hall Blockage

During the second week of January 2008, Messrs. Manzer and Peary learned about a sewage problem with the Masonic Hall. *Id.* ¶ 25. Road Commissioner Little and Mr. Manzer came to the Masonic Hall; Mr. Hill, the Masonic Hall custodian, was present. *Id.* Mr. Manzer snaked the sewerage line and discovered that the blockage was across the road and was the Town's responsibility. *Id.* Mr. Manzer, who held a Class III treatment plant operator's license and collection systems certificate, immediately told Mr. Little about the seriousness of the overflow and the damage to the Hall's basement, and said that they could not safely leave the building as it was. *Id.* ¶ 26. The Hall's upper floors were occupied and one unit had a food pantry. *Id.* Mr. Little replied that he did not want to deal with it, that it was too cold, and that he did not want to hear about it anymore. *Id.* ¶ 27.

Messrs. Manzer and Peary were very upset about the sewage overflow into the Masonic Hall since it was causing severe damage to the historic building, a putrid smell, and continuing drainage into the Carrabasset River. *Id.* ¶ 29. They repeatedly urged Mr. Little to address the problem but Mr. Little repeatedly told the men to "mind their f---king business." *Id.* ¶ 30.

### 5. Trash Disposal

In early 2008, Messrs. Manzer and Peary complained to Mr. Little about the Town's continuing practice of unlawfully disposing of tires, metal, and trash. *Id.* ¶ 31. They asked Mr. Little to have a tire company dispose of old tires scattered on the old landfill and around the shop, explaining to him that the Town could not lawfully or safely dispose or store them. *Id.* ¶ 32. Mr. Little refused, saying the

price was too high. *Id.* Mr. Little also arranged for junior firefighters to burn debris from an old building in the Town's sandpit, instructing Mr. Manzer to plow around the debris using a bucket loader. *Id.* at 33. Mr. Manzer reported to Mr. Little that the DEP prohibited the burning of metals and plastics, but Mr. Little disregarded the report and continued to allow plastic bags and other junk to be burned in the pile. *Id.*

### 6. Timecards

During at least two pay periods in the early spring of 2008, Mr. Little changed the timecards of Messrs. Manzer and Peary without informing them and without their authorization. *Id.* ¶ 34. Mr. Little deleted their overtime, marking it as regular time, even though the written personnel policy provides for overtime pay for work beyond 40 hours

### 7. Selectmen's Meetings

Messrs. Manzer and Peary and other highway crew employees repeatedly tried to attend twice-monthly Selectmen's meetings to report Mr. Little's illegal and unsafe practices. *Id.* ¶¶ 35–43. In one instance, Mr. Little was supposed to provide them with insurance paperwork and inform them what night they were supposed to attend an annual Selectmen's meeting concerning pay and benefits. *Id.* ¶ 36. Mr. Little did neither, and the highway crew employees missed the meeting. *Id.* Two weeks later, as the highway employees were walking in the front door for the next Selectmen's meeting, Mr. Little called Mr. Manzer's cell phone and told him to go to work and to make sure Mr. Peary was told to go to work as well. *Id.* ¶ 37. As Mr.

Manzer left the meeting, he noticed Mr. Little's truck pull out from behind a building just up the street with no lights on headed in the opposite direction. *Id.* He was watching to make sure Mr. Manzer was not present at the Selectmen's meeting long enough to speak with anyone. *Id.* Messrs. Manzer and Peary went out and sanded nearly bare roads. *Id.* The next time the road crew attempted to attend a Selectmen's meeting, Mr. Little heard the crew discussing their plans to attend the 7:00 p.m. meeting. *Id.* ¶ 38. Mr. Little stopped them before they left to tell them they had to come in at midnight to haul snow. *Id.* Mr. Little knew that the crew was very tired, some having just worked over 24 hours with little rest, and that the crew would need to go home and sleep rather than attend the meeting. *Id.* By the next time the workers attempted to attend a Selectmen's meeting, they had caught on to Mr. Little's attempts to keep them from attending. *Id.* ¶ 39. The roads that day were treacherous from inclement weather, but Mr. Little delayed sending them out to sand until 4:00 p.m. so that they would be working during the 7:00 p.m. meeting. *Id.* ¶¶ 39–40. In response, the workers decided to split up their routes and help each other so at least one of them could make the meeting for a little while. *Id.* ¶ 41. Mr. Little realized the crew had caught onto his efforts and became hostile, walking between Messrs. Manzer and Peary and another employee and saying, "if any of you go to that meeting, you will be f---ing replaced." *Id.* ¶¶ 41–42. The three men were upset by this threat to their employment and went to work as instructed. *Id.* ¶ 43.

### 8. Mr. Worthley and the Selectmen

On February 29, 2008, Messrs. Manzer and Peary and two other members of the highway crew met with Mr. Robert Worthley, the Assistant Town Manager and Assistant to the Selectmen. *Id.* ¶¶ 44. They provided him with the following information:

(a) They described in detail how Mr. Little had threatened to fire them if they attended the Selectmen's meetings;

(b) They reported that Mr. Little had successfully prevented them from attending previous Selectmen's meetings;

(c) They reported in great detail the unsafe sewage overflow in the Masonic building, that it had been flooding the basement for seventy days, and Mr. Little's refusal to address it;

(d) They reported that the basement sump pump had continued to deposit unsafe sewage through a hose out the door of the Masonic Building, flowing down the edge of Route 201A to a catch basin that emptied from a storm drain directly into the Carrabasset River;

(e) They reported the risk to public health from the Masonic Hall basement;

(f) They told about the Town's unlawful and unsafe disposal of tires, metal, and plastic;

(g) They reported unlawful wage payments made by Mr. Little to his son for hours not worked;

(h) They told about Mr. Little's unlawfully changing their timecards without their knowledge or authorization.

*Id.* ¶ 44.  It snowed on March 1, 2008, the day after their meeting with Mr. Worthley.  *Id.* ¶ 45.  While Messrs. Manzer and Peary were working, and for the first time in their careers, Selectman Cahill accused them over the county-wide scanner radio of "just riding around with their plows up and doing nothing."  *Id.* Communications over this radio can be heard by members of the public.  Messrs. Manzer and Peary were both properly doing their work and were deeply bothered by these public accusations.  *Id.* ¶ 46.  They allege that Mr. Cahill's comments were in retaliation for their going to the town office the day before and bringing the unsafe practices and conditions and illegal acts to the attention of the Selectmen through their assistant, Mr. Worthley.  *Id.* ¶ 47.

### 9. Resignation

Messrs. Manzer and Peary allege that they were intentionally harassed for making their complaints.  *Id.* ¶ 48.  They resigned their employment on April 7, 2008.  *Id.* ¶ 49.  When they resigned, Mr. Little said to them, "I knew you'd quit.  I just didn't think it would be this soon."  *Id.*

### C. The Parties' Positions

### 1. The Defendants' Motion

The Defendants argue that the Plaintiffs have failed to allege a constitutional deprivation in Count I.  *Defs.' Mot* at 4.  They assert that Messrs. Bartlett, Lane and Moody, "are not even accused in the Complaint as having done anything violative of

the Plaintiffs' rights, in either their individual or representative capacities." *Id.* at 5. Regarding Mr. Luce, they say he is only alleged to have attended a meeting in which he listened to the Plaintiffs' grievances. *Id.* Defendants contend "[t]here are no allegations that he in any way attempted to inhibit [the Plaintiffs'] speech or retaliated against them for exercising their free speech rights." *Id.*

Defendants turn to the allegations against Selectman Cahill. They note that he was alleged to have transmitted over a county-wide scanner that the Plaintiffs were not doing their jobs properly. *Id.* at 5–6 (citing *Compl.* ¶¶ 45–46). Defendants contend that this allegation amounts to a claim of defamation against Selectman Cahill, and they state that "[a] plaintiff is not entitled to assert a defamation claim under the Constitution solely because the speaker was a government actor." *Id.* at 6. They argue that "[t]o state a § 1983 claim arising out of alleged false statement, the plaintiff must establish that some interest protected by the Constitution, either a liberty interest or a property interest, was harmed by the government actor's speech. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 708–09 (1976), and *Siegert v. Gilley*, 500 U.S. 226, 233–34 (1991)). They assert that "[i]nterest in one's reputation is not a liberty or property interest." *Id.*

Next, the Defendants contend that even if the elements of a § 1983 claim are established, the Selectmen are entitled to qualified immunity. *Id.* They say that the First Circuit uses a three-part test to determine whether officials' conduct is protected by qualified immunity: "1) whether the plaintiff's allegations, if true, establish a constitutional violation; 2) whether the right was clearly established at

the time; and 3) whether a reasonable official, similarly situated would understand the conduct violates that established right." *Id.* at 6–7 (citing *Phillip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008)). They assert that "if element (1) of the three part qualified immunity test is not met, element (3) cannot be met, and in fact is not met here as against these individual Selectmen."[2] *Id.* at 7.

### 2. The Plaintiffs' Response

The Plaintiffs respond that their "complaint contains sufficient facts from which a plausible inference can be drawn that the Selectmen named in the complaint are individually liable under . . . § 1983." *Pls.' Opp'n.* at 3. They argue that in the summer of 2007 they shared with Selectmen Luce and Cahill a list of unsafe or illegal practices. *Id.* They point to paragraph 18 of the Complaint which alleges that Selectman Cahill said that he was going to give a copy of the list to all other Selectpersons. *Id.* at 4. Plaintiffs say this "supports a reasonable inference that all the other Selectmen had notice" of the list of complaints. *Id.* They argue that "[t]he Selectmen's failure to act on these complaints involving issues of public concern directly contributed to a hostile, retaliatory work environment for Mr. Manzer and Mr. Peary, leaving the burden on them to continue raising these and other important issues with the new Road Commissioner, Mr. Little." *Id.*

Plaintiffs also argue that the Selectmen knew Mr. Little was violating their free speech rights and failed to act to prevent or correct them. *Id.* They point to the

---

[2] The Defendants also argue that the individual Defendants should be dismissed from Count II. *Id.* 7-8. However, the Plaintiffs correctly point out in their opposition that Count II "is expressly limited to Defendant Town of Anson and does not seek liability against any of the individual Defendants." *Pls.' Opp'n.* at 2. *See also Compl.* ¶ 67 (naming only Town of Anson in Count II). Therefore, the Court does not reach the Defendants' arguments regarding Count II.

February 29, 2008 meeting between the Plaintiffs and Mr. Worthley, in which the Plaintiffs explained that Mr. Little had been preventing them from attending Selectmen's meetings and threatening to fire them if they did attend. *Id.* at 5. Plaintiffs argue that from these facts, along with Selectman Cahill's alleged scanner transmission the following day disparaging Plaintiffs' work-ethic, "the Court can plausibly infer that the substance of the meeting with Mr. Worthley . . . had been communicated to the individual Selectmen." *Id.* They contend that the failure of the Selectmen to act on the complaints amounted to "deliberate indifference," which led to Mr. Little's continued "campaign of harassment" against the Plaintiffs and their constructive discharge. *Id.* at 6.

They maintain that Defendants' arguments for dismissing Selectman Cahill are particularly weak because he "directly retaliated against Mr. Manzer and Mr. Peary by making false allegations concerning their work over the county wide scanner." *Id.* They argue that from the short time between their meeting with Mr. Worthley and Selectman Cahill's comments, "a plausible inference can be drawn that the comment was in direct retaliation for the Plaintiffs' exercise of their free speech rights the day before." *Id.*

Applying the same three-part test as the Defendants for determining whether a public official's conduct is not protected by qualified immunity, the Plaintiffs argue that all three elements are met here, precluding qualified immunity for the Selectmen. *Id.* at 6–14.

The Plaintiffs break down the first prong of the three-part test—whether the speech involves a matter of public concern—positing that in cases alleging free speech retaliation against a public employee, the first prong itself has three elements: 1) whether the speech involves a matter of public concern; 2) whether, when balanced against each other, the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently; and 3) whether the protected speech was a substantial or motivating factor in the adverse action against the plaintiff." *Id.* at 7.

The Plaintiffs argue that their speech was a matter of public concern because the topics were "clearly a matter of inherent concern to the electorate." *Id.* at 8 (citing *O'Connor v. Steeves*, 994 F.2d 905, 913–14 (1st Cir. 1993)). They cite the Complaint, which alleges that "they brought or attempted to bring numerous issues to light to Town officials involving Town road safety, public health, environmental degradation, and the corruption of Town officials in perpetrating these acts against the public welfare." *Id.* at 8. The Plaintiffs further argue that their speech "approaches the highest rung of the hierarchy of First Amendment values" because it concerned government corruption and mismanagement. *Id.* (internal quotations omitted).

Turning to the second prong, the Plaintiffs argue that their and the public's First Amendment interests outweigh the government's interest in functioning efficiently. *Id.* at 9–10. They cite case law which they say establishes the importance of public employees being able to speak on issues of public concern

without fear of retaliation or intimidation. *Id.* The Plaintiffs assert that the government's interest in functioning efficiently was not compromised by their attempts to address the issues because the Plaintiffs "were not disruptive, used appropriate forums, and went directly to the source when possible." *Id.* at 10.

The Plaintiffs contend that their allegations raise a plausible inference that the speech at issue was a substantial factor in the adverse employment action. *Id.* at 10–12. Citing case law, they argue that, especially in the First Amendment context, the standard for showing an adverse employment action is very low and that a plaintiff need only show that actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 11 (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). The Plaintiffs point to their allegation that, upon learning of their resignation, Mr. Little said to the Plaintiffs, "I knew you'd quit. I just didn't think it would be this soon." *Id.* at 12. They say this supports the causal connection between their speech and the Selectmen's "tacit authorization of the campaign of harassment against them in response." *Id.* Moreover, they say their allegations support a plausible inference that Selectman Cahill's comments over the county-wide scanner were substantially motivated by the Plaintiffs' complaints because the comments were made the day after their complaints and because "they both had over a decade of a spotless work record." *Id.* at 12.

The Plaintiffs then argue that the second element of the qualified immunity test—whether their rights were clearly established—is met. *Id.* at 12–13. They cite

case law to support their assertion that "the right of a public employee to speak on matters of public concern is clearly established." *Id.*

Finally, the Plaintiffs contend that the third element of the qualified immunity test is met because "[a] similarly situated Selectman would have understood that the harassment and constructive discharge of Plaintiffs violated their constitutional rights of free speech." *Id.* at 14. They argue that, where there is nothing to indicate the functioning of the government was disrupted by a plaintiff's speech, "a reasonable public official should know that retaliation is unjustified." *Id.* Here, the Plaintiffs say that there is no evidence that their reports were in any way disruptive or that there was any legitimate basis to suppress their speech. *Id.*

### 3. The Defendants' Reply

Regarding Selectmen Bartlett, Lane, Moody, and Luce, the Defendants assert they should be dismissed because "Plaintiffs provide no basis" for their individual liability. *Defs.' Reply* at 2. The rest of their reply focuses on Selectman Cahill.

The Defendants acknowledge that Selectman Cahill listened to the Plaintiffs' complaints in the summer of 2007, but they observe that this was "more than seven months before the operative events" and argue that there are no allegations of retaliation as a result of those complaints. *Id.* To emphasize their claim that Selectman Cahill did not retaliate for those comments, Defendants note that Selectman Cahill did not discourage the Plaintiffs from meeting with Mr. Worthley in February 2008. *Id.*

Defendants assert that the case "boils down to" the statement Selectman Cahill made over the countywide scanner the day after the Plaintiffs' meeting with Mr. Worthley. *Id.* They note that the Plaintiffs refer to these statements as defamatory. *Id.* However, the Defendants argue that the Plaintiffs have failed to adequately allege defamation because there is no allegation that the comments were published to a third party. *Id.* at 2–3 (citing *Cookson v. Brewer Sch. Dep't.*, 2009 ME 57, ¶ 27, 972 A.2d 276, 285).

They next argue that a retaliation claim must allege retaliatory conduct that is "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Id.* at 3. The Defendants contend that this standard requires the retaliation to have actually had a chilling effect on the plaintiff, "assuming he was of ordinary firmness." *Id.* They assert that the Plaintiffs "were not in fact intimidated by the so-called retaliation" because the Plaintiffs made attempts to return to Selectmen's meetings after Selectman Cahill's comments over the scanner.[3] *Id.*

The Defendants then outline a separate standard for adverse employment action. *Id.* at 5. They argue that for purposes of a § 1983 claim, employment actions are adverse "if those actions objectively evaluated, would place substantial pressure on even one of thick skin to conform to the prevailing political view; such standard is met when the employer's challenged actions result in a work situation unreasonably inferior from the norm for the position." *Id.* (citing *Rodriguez-Garcia*

---

[3] The Defendants make a series of arguments regarding the MWPA and MHRA. *Id.* at 3–5. Because the Plaintiffs bring no MWPA or MHRA claims against the Selectmen, the Court does not address those arguments

*v. Miranda-Marin*, 610 F.3d 756, 766 (1st Cir. 2010)).  They assert that Selectman Cahill's comment was "not significant enough to constitute an adverse employment action."  *Id.*  They further assert that, even if Mr. Little's actions amounted to constructive discharge, "it can hardly be said that . . . the single sentence uttered by [Selectman] Cahill more than a month before the Plaintiffs' resignations, was a substantial factor in that constructive discharge."  *Id.* at 5–6.

## II.  DISCUSSION

### A.  Motion to Dismiss Legal Standard

Rule 12(b)(6) provides, in part:

> Every defense to a claim for relief in any pleading . . . must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted . . . .

FED. R. CIV. P. 12(b)(6).  In ruling on a motion to dismiss under Rule 12(b)(6), a court "must assume the truth of all well-plead facts and give the plaintiffs the benefit of all reasonable inferences therefrom."  *Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62, 68 (1st Cir. 2010).  To survive a motion to dismiss, "a complaint must establish a plausible entitlement to relief."  *Id.* (internal quotations omitted).

### B.  Elements of a § 1983 Claim

Section 1983 provides that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. The First Circuit has held that to bring a § 1983 claim alleging that his employer retaliated against him for exercising his First Amendment rights, a public employee must demonstrate: (1) that he "spoke as a citizen on a matter of public concern;" (2) that the relevant government entity had no "adequate justification for treating the employee differently from any other member of the general public;" and (3) that his "protected expression was a substantial or motivating factor in the adverse employment decision." *Barton v. Clancy*, No. 08-2479, 2011 WL 117261, at *17 (1st Cir. Jan. 14, 2011) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)) (internal quotation marks omitted).

## C.    Analysis of § 1983 Claim Against Individual Selectmen

The Defendants do not contest that the Plaintiffs have pleaded sufficient facts to raise a reasonable inference to meet the first two elements of a free speech retaliation claim as to each individual Selectman.[4]    The gravamen of the Defendants' argument is that the Plaintiffs have not pleaded facts sufficient to raise a reasonable inference to meet the third element, *i.e.* that the Plaintiffs' protected

---

[4] The Plaintiffs allege that they repeatedly complained about health and safety issues impacting public employees and facilities, *Compl.* at ¶¶ 18, 21–28, 30–33, 44, and about Mr. Little's covering up those issues and suspected violations of law, *Id.* ¶ 44. These issues implicated public health and safety concerns in Anson.    Their complaints about Road Commissioner Little amounted to accusations of corrupt practices at the leadership level of municipal government.    The allegations support a reasonable inference that the expressions were matters of public concern. *Nethersole v. Bulger*, 287 F.3d 15, 18 n.5 (1st Cir. 2002); *see also Mihos v. Swift*, 358 F.3d 91, 102-03 (1st Cir. 2004) ("Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression" (internal quotations omitted)).

The Plaintiffs also raise a reasonable inference that the Selectmen had no adequate justification for treating the Plaintiffs differently from other members of the general public.    The Defendants have not suggested there was any risk that the Plaintiffs' expression did or could have hampered the performance of public services.

expression was a substantial or motivating factor in the individual Selectmen's adverse employment action. *Defs.' Mot.* at 4–5. The Court disagrees.

The First Circuit recently clarified the standard for proving adverse action in a § 1983 claim. *Barton,* 2011 WL 117261. The *Barton* Court clarified that "[f]or purposes of a First Amendment retaliation claim, even in an employment setting, a plaintiff need not suffer an 'adverse employment action' as the term ordinarily is used in the employment discrimination context." *Id.* at 18. The term, "adverse employment action" arose as shorthand for the statutory requirements of a Title VII employment claim, but "there is no similar requirement for a First Amendment claim filed pursuant to § 1983." *Id.* "Instead, the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views—or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." *Id.* (quoting *Bergeron v. Cabral*, 560 F.3d 1, 7–8 (1st Cir. 2009)) (internal quotation marks omitted). The First Circuit explained that the "pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter a reasonably hardy individual from exercising his constitutional rights." *Id.* Further specifying the type of conduct that can deter a reasonably hardy individual, the First Circuit stated that a campaign of harassment, "knowingly tolerated by superiors," can form the basis for a § 1983 claim. *Rosario-Urdaz v. Velazco*, 433 F.3d 174, 179 (1st Cir. 2006); *See also Rodriguez-Garcia v. Municipality of Caguas*, 495 F.3d 1, 10 (1st Cir.

2007) ("Municipal officials may only be held liable under § 1983 in their personal capacity if the plaintiff can establish that her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.").

The Plaintiffs allege a campaign of harassment by Mr. Little. They claim that over the course of several months, Mr. Little deterred them from exercising their First Amendment rights by deleting overtime from their timecards, forcing them to work unnecessarily during Selectmen's meetings, and threatening their employment. *Compl.* ¶¶ 30, 34–43. The Court concludes that Mr. Little's actions would deter a reasonably hardy individual from exercising his free speech rights. Indeed, the Plaintiffs allege that they were so deterred, *Compl.* ¶ 41–43, and the Court accepts that allegation for purposes of this motion.

The Plaintiffs' allegations regarding the Selectmen's response to that campaign of harassment just barely state a plausible entitlement to relief against the Selectmen. The Complaint raises a reasonable inference that all the named Selectmen knew of the Plaintiffs' February 29 protected speech to Mr. Worthley before the Plaintiffs resigned. *Compl.* ¶¶ 44–47, 49. However, it is silent as to whether they acted in response to that information.[5] This allegation is sufficient only because of the low standard of supervisor liability in the First Amendment retaliation context. Despite the Plaintiffs' failure to allege how the Selectmen responded (or did not respond) to the protected speech, the remaining allegations in

---

[5] The one exception is the allegation regarding Selectman Cahill's comments. *Compl.* ¶ 45–47. However, there is no allegation linking those comments to the other Selectmen, and it would be conjecture to infer such a link.

19

the Complaint, taken as a whole, raise a reasonable inference that they did nothing in response. This inference raises another inference. Because the Complaint alleges that the Selectmen knew about the Plaintiffs' protected speech to Mr. Worthley, their inaction could be characterized as knowing tolerance, or tacit authorization of Mr. Little's conduct. Since knowing inaction can be grounds for supervisory liability in this context, the allegations that the Selectmen knew of the Plaintiffs' complaints about Mr. Little are sufficient to survive a motion to dismiss.

The merits of the motion to dismiss are closer than they may have had to be if the Complaint had been less cryptic. In their Complaint, the Plaintiffs set forth a scant set of specific alleged facts regarding the individual Selectmen and rely on an inference to be taken on another inference to deflect the motion to dismiss. Relying on inferences upon inferences is a risky strategy and stretches the *Genzyme* directive nearly to the breaking point. However, under *Genzyme*, the Court is required to "assume the truth of all well-plead facts and give the plaintiffs the benefit of all reasonable inferences therefrom." 622 F.3d at 68. Following this directive, the Court concludes that the Complaint contains sufficient allegations— together with reasonable inferences therefrom—to withstand a motion to dismiss on whether the Plaintiffs' exercise of free speech rights was a substantial or motivating factor in the Selectmen's adverse employment action.

### D. Qualified Immunity

In response to a recent Supreme Court decision, the First Circuit has abandoned its three-step qualified immunity analysis and adopted a two-step

analysis. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). Under the analysis, public officials are not entitled to immunity if (1) the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) the right was "clearly established" at the time of the defendant's alleged violation. *Id.*

### 1.    Prong One:  The Constitutional Violation

The Court completed the first step in the previous section, finding that the alleged facts make out a violation of a constitutional right by each of the Selectmen. The Court turns to the second step of the qualified immunity analysis.

### 2.    Prong Two:  The Right was Clearly Established

The First Circuit recognized that the second step of the qualified immunity analysis itself has two aspects, making it substantively the same as the First Circuit's old three-part analysis. *Id.* The first aspect asks whether the law was sufficiently clear at the time of the alleged civil rights violation. *Id.* The second asks "whether, given the facts of the particular case, a 'reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.'" *Id.* (quoting *Maldonado*, F.3d at 269). Synthesizing these two aspects, the First Circuit articulated the second step's relevant inquiry as "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* (quoting *Maldonado*, F.3d at 269). The conduct in question need not have been previously found unlawful to fall outside qualified immunity protection. *Id,* Rather, "in the light of pre-existing law, the unlawfulness

must be apparent". *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal quotation marks omitted)).

A court conducting a qualified immunity analysis should "use its "full knowledge of its own [and other relevant] precedents." *Id.* at 12 (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). The court must determine whether there was case law of controlling authority at the time of the incident or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Id.* The determination should consider relevant authorities "both in circuit and out of circuit." *Id.* The Court therefore looks to the relevant authority on free speech retaliation as of March 2008, the date of the Selectmen's alleged constitutional infringement. *See Barton*, 2011 WL 117261 at *3, 12 (evaluating whether the right at issue was clearly established as of April 2006, the date of the alleged constitutional violation). It must determine whether the law at that time gave the Selectmen "fair warning" that their failure to act in light of the Plaintiffs' complaints about Mr. Little amounted to a constitutional violation.

### a.    First Aspect:  Clarity of the Law in General

In 2004, the Court recognized a circuit split as to what constituted an adverse employment action in the First Amendment context. *Cole v. Maine School Administrative District Number 1*, 350 F. Supp. 2d 143, 151-54 (D. Me. 2004). The Court observed that the Seventh and Ninth Circuits had adopted similar inquiries that focused on whether an action was reasonably likely to deter employees from

exercising free speech. *Id.* (citing *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) and *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) ("Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable")). *See also Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) ("we conclude that a factfinder in this case could determine that the alleged retaliatory conduct was sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights and that some relief may be appropriate.").

The Court noted that the Fifth Circuit, however, imposed a higher standard. *Cole*, 350 F. Supp. 2d at 152–53. In *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000), the Fifth Circuit refused to expand its list of adverse actions beyond "discharges, demotions, refusals to hire, refusals to promote, . . . reprimands," and transfers "if they are sufficiently punitive." The *Breaux* court noted that "some things are not actionable even though they have the effect of chilling the exercise of free speech." *Id.* (quoting *Beningfield, v. City of Houston*, 157 F.3d 369 376 (5th Cir. 1998)). Although *Barton* has now clarified that the First Circuit standard generally follows the Seventh and Ninth Circuits, *see* 2011 WL 117261 at *18, this Court found in 2004 that it was "unclear precisely which formulation the First Circuit would adopt." *Cole*, 350 F. Supp. 2d at 154.

Nevertheless, even in the absence of a clearly-articulated standard, the First Circuit prior to 2008 had demonstrated a tendency to define adverse employment action broadly in the First Amendment free speech context. The First Circuit held

in 2004 that "the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts." *Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004). It cited the Supreme Court's indication that "even relatively minor events might give rise to liability." *Id.* (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75-76 (1990)). The *Barton* Court, in its own qualified immunity analysis, held that in 2006 and 2007, it was clearly established that a campaign of harassment could support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights. 2011 WL 117261 at *19. The Court, finds, therefore, that the law was clear in March 2008 that adverse employment action in § 1983 free speech cases was conduct likely to deter a reasonably hardy person from exercising his free speech rights.

The question remains whether it was clearly established in March 2008 that the Selectmen's failure to act was grounds for liability. By 2007, the First Circuit had repeatedly articulated the idea that supervisors could be liable under § 1983 for failing to put a stop to known constitutional violations. As far back as 1995, it stated that a supervisor could be held liable under § 1983 liability where his inaction could be characterized as "condonation," "acquiescence," or "gross negligence amounting to deliberate indifference." *Hegarty v. Somerset County*, 53 F.3d 1367, 1379–80 (1st Cir. 1995); *See also Whitfield v. Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005) ("Supervisor liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that

amounts to condonation or tacit authorization); *accord Rodriguez-Garcia*, 495 F.3d at 10. By 2006, the First Circuit appeared to have moved away from an analysis of such terms of art; instead it focused on whether supervisory officials had notice of alleged constitutional violations and tried to stop them. The *Rosario-Urdaz* court stated that a "a substantial campaign of harassment, instigated or knowingly tolerated by superiors, . . . constitute[s] the mis-exercise of government power at which section 1983 is aimed." *Rosario-Urdaz*, 433 F.3d at 179. Accordingly, by 2008, the law was clear that municipal officials could be liable under § 1983 for failing to act against known constitutional violations.

### b. Second Aspect: Clarity of the Law As Applied

Finally, the Court turns to the second aspect of the second prong of the qualified immunity analysis: whether, given the facts of this case, a reasonable Selectman would have understood that his conduct violated the Plaintiffs' constitutional rights. Allowing a supervisor to repeatedly threaten his subordinates' employment for exercising their free speech rights is reasonably likely to chill the subordinates' exercise of those rights. Based on the allegations in the Complaint, the Selectmen knew that a subordinate employee was harassing his own subordinates in violation of their constitutional rights, yet they chose to do nothing. Reasonable public officials would have realized that their failure to intervene unlawfully furthered the constitutional violations.

Because the Court finds that the law on free speech retaliation was sufficiently clear at the time of the Selectmen's alleged conduct that they should

have known that their alleged conduct was unlawful, the Court finds that the Selectmen are not entitled to qualified immunity.

## III.    CONCLUSION

The Court DENIES the Individual Defendants' Motion to Dismiss (Docket # 5).

SO ORDERED

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 23rd day of March, 2011